UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

JOHN DOE, an individual,

      Plaintiff,

v.

CONGREGATION OF THE PRIESTS OF
THE SACRED HEART, INC.; THE
ARCHDIOCESE OF PORTLAND IN
OREGON, an Oregon corporation; THE
ROMAN CATHOLIC ARCHBISHOP OF
PORTLAND IN OREGON and successors, a
corporation sole d.b.a. THE ARCHDIOCESE
OF PORTLAND IN OREGON; BRYAN
BENOIT, an individual; PRIESTS OF THE
SACRED HEART,

      Defendant.

Case No. 6:22-cv-00309-MTK

**OPINION AND ORDER**

**KASUBHAI,** United States District Judge:

      In this action, Plaintiff John Doe, a victim of child sexual abuse, seeks to hold Defendant

Archdiocese of Portland in Oregon and Defendant Priests of the Sacred Heart liable for the

conduct of Defendant Bryan Benoit, his abuser. Before the Court are Defendant Archdiocese's

Motion for Summary Judgment, ECF No. 72, and Defendant Priest of the Sacred Heart's Motion

for Partial Summary Judgment, ECF No. 74. For the reasons below, Defendant Archdiocese's

motion is granted in part and denied in part, and Defendant Priest of the Sacred Heart's motion is denied.

## BACKGROUND

### I.    The Parties

As a minor, Plaintiff John Doe ("Plaintiff") was as an altar server at Holy Redeemer Catholic Church in North Bend, Oregon ("Holy Redeemer"). Pl. Decl. ¶¶ 3-4, ECF No. 82-3. Defendant Archdiocese of Portland in Oregon ("Defendant Archdiocese") ministers Catholic parishes that fall within its geographic borders including Holy Redeemer. Halpern Decl. I Ex. 1 ("Pl. Dep. Leinert") 207:3-6, ECF No. 82-1. Defendant Bryan Benoit ("Defendant Benoit"), an ordained catholic priest and member of the Priests of the Sacred Heart, worked at Holy Redeemer and sexually abused Plaintiff. Cotton Decl. III Ex. 1 ("Pl.'s Expert Disclosure") ¶¶ 17, 46, ECF No. 92. Defendant Priests of the Sacred Heard ("Defendant POSH") is a Catholic organization headquartered in Wisconsin. *Id.* ¶¶ 37-39. As a member of Defendant POSH, Defendant Benoit needed its recommendation, and Defendant Archdiocese's permission, to perform religious ceremonies at Holy Redeemer. DeDobbelaere Decl. I. Ex. 4 at 50:11-25, ECF No. 75-4.

### II.    Defendant Benoit's Relationship with Defendant Priests of the Sacred Heart and Defendant Archdiocese of Portland in Oregon

Defendant Benoit testified POSH employed him from 1988 until 2018. Halpern Decl. II Ex. 2 ("Pl. Dep. Benoit II") 59:5-8, ECF No. 83-1. POSH gave Defendant Benoit a stipend and other benefits at various times during his employment. *Id.* at 19:4-19, 50:17-24,53:2-11. In 1993, Defendant Benoit was ordained to the priesthood. Pl.'s Expert Disclosure ¶ 17. He had two assignments between 1993 and 1996 to parishes in Houston, Texas. *Id.* ¶¶ 17-18. In a meeting of POSH's provincial council, a councilor expressed concern over Defendant Benoit's alcoholism

and behavior around youth in Texas, and POSH placed Defendant Benoit "on a leave of absence" in 1996. DeDobbelaere Decl. I Ex. 1 ("Def. POSH Dep. Benoit") 376:19-377:8, ECF No. 75-1; Cotton Decl. II Ex. 3 ("Def. Arch. Dep. Czyzynski") 161:9-20, 162:5-10, 163:24-165:5, ECF No. 90-3. Defendant Benoit then underwent several treatment programs for his alcoholism. Pl.'s Expert Disclosure ¶ 41. Before arriving in Coos Bay, Oregon, Defendant Benoit was receiving treatment in Southern California. Def. Arch. Dep. Czyzynski 174:16-175:8. Defendant Benoit's POSH provincial supervisor, Father Czyzynski, transferred Defendant Benoit from a treatment facility in California to Coos Bay upon the recommendation of Defendant Benoit's treating physician, Dr. Bob Mellen. *Id.* Father Czyzynski had final say over Defendant Benoit's assignments, including his transfer to Coos Bay. *Id.*; Cotton Decl. I Ex. 2 at 374:20-375:5, ECF No. 73.

By 1998, Defendant Benoit was in Coos Bay, helping Dr. Mellen manage a sober living house. Def. POSH Dep. Benoit 61:17-62:6. After Defendant Benoit worked in the sober living house for six months, Father Czyzynski thought it was time to get Defendant Benoit involved in church ministry again. *Id.* at 62:7-19. Dr. Mellen introduced Defendant Benoit to Father Karl Schray, the lead pastor at Holy Redeemer, to help him get back into the ministry, and Father Schray invited Defendant Benoit to live at Holy Redeemer. *Id.* at 353:16-354:10.

In March 1998, Father Czyzynski wrote to Defendant Archdiocese and informed it that Defendant Benoit was being treated in Coos Bay for alcoholism but did not discuss any concerns over Defendant Benoit's relationships with youth or sexual conduct. Pl.'s Expert Disclosure ¶ 45. In July 1998, Defendant Archdiocese granted Father Schray's request that Defendant Benoit receive faculties[1] to celebrate the Eucharist, preach, celebrate penance, and hear confessions as a

---

[1] Faculties are the authority to perform certain religious rites. *See* Pl. Dep. Leinert 75:12-20.

priest in residence at Holy Redeemer. Pl. Dep. Leinert 76:14-77:13. Defendant Archdiocese did

not assign Defendant Benoit to Holy Redeemer. Cotton Decl. II Ex. 8 at 47:3-9, ECF No. 90-8.

In July 1998, Father Czyzynski allowed Defendant Benoit to use the faculties to hear confessions

granted to Defendant Benoit by Defendant Archdiocese. Halpern Decl. II Ex. 11, ECF No. 83-1.

Father Czyzynski was ultimately responsible for recommending that Defendant Archdiocese

grant Defendant Benoit faculties. Def. Arch. Dep. Czyzynski 175:9-14. Father Czyzynski issued

Defendant Archdiocese letters of Defendant Benoit's good standing in December 1998 and

March 1999. Halpern Decl. II Exs. 10, 12, ECF No. 83-1.

## III.    Defendant Bryan Benoit and Plaintiff

Plaintiff was already a trained altar server when Defendant Benoit arrived at Holy

Redeemer in 1998. Def. POSH Dep. Benoit 69:11-16. Defendant Benoit did not train, schedule,

or supervise the altar servers. Halpern Decl. I Ex. 2 ("Pl. Dep. Benoit") 68:3-10, ECF No. 82-1.

Father Schray supervised Defendant Benoit's daily activities related to his faculties.

DeDobbelaere Decl. I Ex 3 at 99:6-16, ECF No. 75-3. As an altar server, Plaintiff would remain

near Defendant Benoit during the service, hold the Bible for Defendant Benoit's readings, hold

server plates beneath Defendant Benoit's hands, and follow Defendant Benoit's instructions

when Defendant Benoit led mass. Pl. Decl. ¶ 10. Plaintiff would bring questions he had about

altar service to Defendant Benoit, and Defendant Benoit would ask the altar servers if they had

any questions. Pl. Decl. ¶¶ 8-9. Defendant Benoit shared the sign of peace with Plaintiff by

hugging him on the altar. Pl. Decl. ¶ 13. Plaintiff stated that after mass Defendant Benoit would

thank him for his altar service, ask him how he was, and ask him about his mother. Pl. Decl. ¶

14.

After Defendant Benoit arrived at Holy Redeemer, he began to email Plaintiff about Plaintiff's personal life from a private email account. Cotton Decl. I Ex. 7 "Def. Arch. Dep. Pl." 230:3-6, 234:2-7, ECF No. 73; Pl. Decl. ¶ 15. Defendant Benoit gave Plaintiff a pair of purple headphones and attended one of his basketball games. Def. Arch. Dep. Pl. 162:16-18; Pl. Dep. Benoit 210:20-211:20. Defendant Benoit went to Plaintiff's basketball game because Plaintiff asked him to and because he and Father Karl Schray, the lead pastor at Holy Redeemer, tried to be involved with the church youth's events. Pl. Dep. Benoit 211:8-18; Pl. Dep. Benoit II 63:4-11. On one occasion, Defendant Benoit gave Plaintiff's mother an audio CD at Plaintiff's home. Halpern Decl. I Ex. 8 at 85:13-20, ECF No. 82-1.

In early 1999, Defendant Benoit initiated email communication with Plaintiff and they began exchanging sexually explicit emails through Defendant Benoit's personal email account. Pl. Dep. Benoit 268:2-8, 270:8-12. Six to twelve weeks after Defendant Benoit and Plaintiff started emailing each other, Defendant Benoit sexually abused him. Def. Arch. Dep. Pl. 168:23-169:1; Pl.'s Expert Disclosure ¶ 46. The abuse occurred in short spans of thirty seconds to two minutes at Holy Redeemer—once in the confessional, once in the bathroom, once in the basement, once in the storage room, and several times in the altar server vestry—over the course of nine months to one year between June 1999 and April 2000. Halpern Decl. I Ex. 7 ("Pl. Dep."), 183:5-25, 185:2-24, ECF No. 82-1; Def. Arch. Dep. Pl. 169:2-5; Pl.'s Expert Disclosures ¶ 46. The abuse often occurred shortly before mass. Pl. Dep. 155:16-156:11 (confessional), 177:9-178:13 (bathroom), 170:22-171:13 (basement), 181:15-182:3 (storage room). Some of Defendant Benoit's abuse occurred while Plaintiff was preparing for altar service. Pl. Decl. ¶ 18.

POSH removed Defendant Benoit from Holy Redeemer in April 2000. Cotton Decl. I Ex. 2 at 375:14-376:11, ECF No. 73.

## STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

## DISCUSSION

### I.    Threshold Issues

Before turning to the merits of Defendants' motions, the Court must address two evidentiary issues raised by Defendant Archdiocese in its reply in support of summary judgment. Specifically, Defendant Archdiocese asks the Court to strike or disregard (A) certain testimony from Plaintiff's expert Thomas Doyle ("Mr. Doyle"), ECF No. 82-2, that Defendant alleges was not timely disclosed; and (B) portions of Plaintiff's declaration in opposition to summary

judgment, ECF No. 82-3, that Defendant argues is clearly contradictory to Plaintiff's earlier deposition testimony. The Court addresses each issue in turn below.

A.    **Expert Testimony from Mr. Doyle**

Defendant Archdiocese moves to strike portions of a declaration of Plaintiff's expert Mr. Doyle, arguing that the opinions in that declaration were not timely disclosed. Rule 26(a)(2) provides that expert witness disclosures must be accompanied by a written report containing, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Rule 37(c)(1) provides that a party that does not disclose information required by Rule 26(a) may not "use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also Yeti by Molly Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir. 2001) ("Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed.").

Here, Defendant Archdiocese moves to strike paragraphs 16-18 of Mr. Doyle's declaration, ECF No. 82-2. Plaintiff filed the declaration at issue in support of his response to Defendant Archdiocese's motion for summary judgment on August 12, 2024, more than two months after the close of expert discovery on June 1, 2024. ECF No. 65; Doyle Decl., ECF No. 82-2. The paragraphs at issue provide opinions about whether various acts of Defendant Benoit's were part of Defendant Benoit's employment duties and performed for the purpose and benefit of serving Defendants Archdiocese and POSH. Doyle Decl. ¶¶ 16-18. In other words, they provide opinions on an issue central to Defendants' motions: whether Defendant Benoit's abuse of Plaintiff resulted from acts within the course and scope of his employment with Defendants Archdiocese and POSH. Defendant Archdiocese argues that these opinions were not disclosed as

required by Rule 26(a)(2) prior to the close of expert discovery and must therefore be stricken under Rule 37(c)(1).

Plaintiff argues that the opinions expressed in the declaration are not new and were disclosed in the expert's timely-disclosed report. Plaintiff specifically directs the Court to certain paragraphs of Mr. Doyle's report that Plaintiff contends contain the timely-disclosed opinions. Pl.'s Surreply 4-5, ECF No. 91. But those paragraphs do not contain the disputed opinions. Rather, those paragraphs provide general background or contain passing references to "grooming" that do not provide "a complete statement" of an opinion on vicarious liability nor "the basis and reasons" for such an opinion. Pl.'s Expert Disclosure ¶¶ 17, 39, 42, 46; *see also* Rule 26(a)(2)(B)(i). Moreover, a review of Plaintiff's expert witness disclosures with respect to Mr. Doyle does not reflect any intent to have Mr. Doyle opine on the issue of vicarious liability. Pl.'s Expert Disclosure. Instead, the disclosures reflect that Mr. Doyle would opine on the standard of care for purposes of a negligence claim. *Id.* In sum, the Court concludes that the opinions expressed in paragraphs 17-19 of Mr. Doyle's declaration were not previously disclosed in his expert report and are therefore untimely.

Plaintiff alternatively argues that, even if untimely, the Court should decline to exercise its discretion to strike paragraphs 17-19 under Rule 37(c)(1). While courts are given "particularly wide latitude" in exercising their discretion to issue sanctions, the Ninth Circuit has recognized that Rule 37(c)(1) is "a recognized broadening of the sanctioning power" which is "self-executing," and "automatic." *Yeti by Molly*, 259 F.3d at 1106 (internal citations omitted). There are two exceptions to the application of the sanction: "if the parties' failure to disclose the required information is substantially justified or harmless." *Id.* Plaintiff argues that Mr. Doyle's declaration was justified in light of a late disclosure of unredacted council meeting minute notes

from Defendant POSH. But Plaintiff fails to explain how these meeting minute notes are relevant to Mr. Doyle's opinion on the issue of vicarious liability, and the Court therefore finds that Plaintiff's late disclosure was not substantially justified. On the issue of harmlessness of the late disclosure, Plaintiff contends that Defendant Archdiocese has "multiple party witnesses" that could have submitted declarations to dispute Mr. Doyle's declaration and that Defendant Archdiocese could have deposed Mr. Doyle before expert discovery closed. But because Mr. Doyle's expert report focused on negligence issues not relevant to Defendant Archdiocese, Defendant Archdiocese had no reason to depose Mr. Doyle on the basis of his opinions on vicarious liability—because none were expressed. On these facts, the Court finds that the untimely disclosure of Mr. Doyle's opinions on vicarious liability is not harmless.

Accordingly, paragraphs 16-18 of Mr. Doyle's declaration, ECF No. 82-2, are stricken.

### B.    Plaintiff's Declaration

Defendant Archdiocese, joined by Defendant POSH, asks the Court to "disregard"[2] portions of the declaration Plaintiff submitted in support of summary judgment on the grounds that his statements are inconsistent with prior deposition testimony. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (citation omitted). This "sham affidavit rule" prevents "a party who has been examined at length on deposition" from "rais[ing] an issue of fact simply by submitting an affidavit contradicting his

---

[2] There was some disagreement during oral argument regarding whether Defendant's argument that the Court "disregard" this evidence—as opposed to a formal motion to strike—sufficiently put Plaintiff on notice that he would be permitted a surreply under the local rules. LR 56-1(b). The Court does not address the issue because, for the reasons explained below, it rules in favor of Plaintiff on this evidentiary objection. Plaintiff is therefore not prejudiced by not having filed a surreply.

own prior testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (citation omitted). Allowing a party to do so "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (citation omitted). However, the rule "'should be applied with caution' because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Yeager*, 693 F.3d at 1080 (citations omitted). Accordingly, "the district court must make a factual determination that the contradiction is a sham, and the 'inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.'" *Id.* (quoting *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998–99 (9th Cir. 2009)). A party may clarify or elaborate on general or cursory statements given in deposition without contradicting those statements. *Van Asdale*, 577 F.3d at 999.

Defendants argue that two specific portions of Plaintiff's declaration should be disregarded as inconsistent with prior deposition testimony. The allegedly inconsistent statements and the Court's respective findings follow:

        1.    <u>Plaintiff's Statements About His In-Person Conversations with Defendant Benoit</u>

Plaintiff's deposition transcript reads:

Q:    Okay. When you would -- well, outside of the email exchange with Father Benoit, did you guys ever have conversations together, like before or after Mass, that didn't involve some sort of abuse?

A:    No.

Def. Arch. Dep. Pl. 237:19-23.

Plaintiff's declaration reads:

Mass Service would end with a recessional with Father Benoit lead [sic] by the Altar Servers, Eucharist Ministers, and Readers toward the back of the church, out of the church doors, and into a Foyer area. Once the recessional group had reached the Foyer area, there was a period of time that the group would interact

with each other before the parishioners came out of the church. During this period of time after the recessional group had exited the church, I recall Father Benoit at different times thanking me for my assistance as an Altar Server, asking me how I had been, and asking me about my mother . . . . Father Benoit would let the Altar Servers know when we were dismissed to return to the Vestry to change out of our robes.

Pl. Decl. ¶ 14.

Here, although the statements have some tension with one another, the question posed to Plaintiff in deposition is unclear and cursory. For example, Plaintiff could reasonably respond "no" if Plaintiff and Defendant Benoit discussed Plaintiff's faith or duties as an altar server shortly before abuse occurred because Plaintiff could perceive that conversation as "involv[ing] some sort of abuse." Because Plaintiff's declaration clarifies a cursory question and answer, the Court finds that Plaintiff's statements above are not clearly and unambiguously inconsistent.

2.    <u>Plaintiff's Statements About His Emails with Defendant Benoit</u>

Plaintiff's deposition transcript reads:

Q    The emails you had with Father Benoit, did they ever include any communications about stuff going at the church, like, "Hey I want to let you know there is this youth ministry class" or was it all just the sexual stuff?

A    It was all personal.

Def. Arch. Dep. Pl. 234:2-7.

Plaintiff's declaration reads:

Prior to becoming an Altar Server, Father Benoit and I exchanged email addresses, and Father Benoit began communicating with me via email. In the beginning, the emails were friendly, courteous, and virtuous. During the first weeks and months of email communication with Father Benoit, he was interested in my faith and life. At the outset I understood the emails to serve as priest-parishioner talking because the communications were social niceties and interests in my daily and spiritual life. I was proud to have Father Benoit talking to me through emails and looked to Father Benoit as a role model and a spiritual counselor. The text of the emails were [sic] in normal black font. Father Benoit signed the emails "Father Bryan."

Pl. Decl. ¶ 15.

Plaintiff's declaration merely clarifies his general answer in deposition that the conversations were "all personal." Discussions over Plaintiff's "faith and life" and "priest-parishioner talking" can reasonably be considered "personal" topics. These statements are not inconsistent with one another.

In sum, because Plaintiff's deposition testimony is not clearly and unambiguously inconsistent with the contested portions of Plaintiff's declaration, ECF No. 82-3 ¶¶ 14-15. Defendants' request to disregard them is denied.

## II.    Respondeat Superior Claims

Defendants POSH and Archdiocese move for summary judgment against Plaintiff's *respondeat superior* claims. Both Defendants argue that Plaintiff's *respondeat superior* claims should fail because Defendant Benoit's abuse of Plaintiff did not result from any act within the scope of Defendant Benoit's employment.[3] An employer is generally liable for an employee's tortious acts within the employee's scope of employment. *Chesterman v. Barmon*, 305 Or. 439, 442 (1988). In Oregon, an employee acts within the scope of employment when the act (1) occurs "substantially within the time and space limits" of employment; (2) is "motivated, at least partially, by a purpose to serve the employer;" and (3) is the kind of act "which the employee was hired to perform." *Id.* Whether an employee acts within the scope of their employment under Oregon law "is normally a question for the jury, except in cases where only one reasonable conclusion can be drawn from the facts." *Stanfield v. Laccoarce*, 284 Or. 651, 655 (1978).

---

[3]  Defendant Archdiocese argues briefly that Defendant Benoit was not an employee. But because Defendant Archdiocese granted Defendant Benoit faculties, and Father Schray, who is under Defendant Archdiocese, supervised Defendant Benoit's daily activities, Defendant Archdiocese controlled Defendant Benoit as an employee. *See Lourim v. Swenson*, 328 Or. 380, 387 (1999).

Oregon courts have adopted a broader *respondeat superior* standard for intentional torts because "vicarious liability would be defeated in almost every instance" otherwise. *Minnis v. Or. Mut. Ins. Co.*, 334 Or. 191, 205 (2002). Under Oregon law, an employer may be vicariously liable for intentional torts outside an employee's scope of employment when acts within the scope of employment result in the injury to the tort victim. *Fearing v. Bucher*, 328 Or. 367, 374 (1999). Acts within the scope of employment result in an intentional tort if they are "'a necessary precursor to the' intentional tort[,] and the intentional tort is 'a direct outgrowth of'" acts within the scope of employment. *Doe v. Holy See*, 557 F.3d 1066, 1083 (9th Cir. 2009) (quoting *Fearing*, 328 Or. at 377). An intentional tort is a "direct outgrowth" of acts within the scope of employment when the tortfeasor manipulates a position of trust and authority to commit the intentional tort. *Fearing*, 328 Or. at 377. The employment relationship must do more than "[bring] the tortfeasor and the victim together in time and place." *Id.* at 376-77 (citing *G.L. v. Kaiser Found. Hosps., Inc.*, 306 Or. 51 (1988)).

Here, the parties focus primarily on two categories of conduct that Defendant Benoit allegedly took within the scope of his employment: (A) his in-person interactions with Plaintiff and (B) his email communications with Plaintiff. The Court addresses each category below and finds that either one creates a question of fact which precludes summary judgment for Defendants.

## A.    Defendant Benoit's In-Person Interactions with Plaintiff

First, Plaintiff argues that his in-person interactions with Defendant Benoit give rise to a question of fact on the issue of Defendants' vicarious liability for Defendant Benoit's abuse of Plaintiff. Specifically, Defendant Benoit spoke with Plaintiff before mass in the altar vestry— where Plaintiff changed for altar service—about the service and any questions Plaintiff or the altar servers had. Defendant Benoit instructed Plaintiff in his altar service and hugged Plaintiff

during mass. Defendant Benoit also spoke with Plaintiff after mass in the church foyer about how Plaintiff and his mother had been. Defendants argue that Defendant Benoit's role in leading mass is insufficient to support liability because it merely created the opportunity for Defendant Benoit to abuse Plaintiff.

The interactions between Plaintiff and Defendant Benoit are analogous to those in *Schmidt*. In *Schmidt*, the court considered the acts of a priest who was the plaintiff's faculty advisor and dormitory proctor. *Schmidt v. Archdiocese of Portland in Oregon*, 235 Or. App. 516, 519-20 (2010). He called the plaintiff into his office, asked the plaintiff about sexuality and reproduction, and then began to masturbate while talking with the plaintiff. *Id.* Because a reasonable jury could find that the acts of counseling the plaintiff on sexuality were within the priest's authority as the plaintiff's advisor and proctor, the court found that the abuse could reasonably have resulted from employment-related conduct motivated by a desire to serve the priest's employer. *Id.* at 522-23.

Like the priest in *Schmidt* whose abuse resulted from a counseling session in his office, Defendant Benoit's conversations and hug took place in church areas—such as the confessional and on the altar—where Defendant Benoit conducted his employment duties. So, Defendant Benoit's discussions took place within the time and space limits of employment. Further, Defendant Benoit spoke with Plaintiff about Plaintiff's faith and personal life before and after mass. Defendant Benoit went to Plaintiff's basketball game with Father Schray, who supervised his daily activities. The content of Defendant Benoit's discussions with Plaintiff (his faith and personal life) and the purpose of his visit to Plaintiff's basketball game (to show support for Plaintiff as a parishioner of Holy Redeemer) show a genuine issue of fact that Defendant Benoit was motivated, at least partially and initially, by a desire to serve his employers. Finally, the

timing of the interactions (before, while, and after Defendant Benoit led mass) and Father Schray's supervision of Defendant Benoit at Plaintiff's basketball game support a reasonable jury finding that these acts were the type of work Defendant Benoit was hired to perform. As a result, Plaintiff has established a genuine issue of material fact that these acts were within the scope of Defendant Benoit's employment.

Defendants argue that Defendant Benoit's employment did not result in the abuse because it merely brought Plaintiff and Defendant together in time and place and created the opportunity for the abuse. Plaintiff argues this case is analogous to *Doe v. Holy See*. There, the plaintiff alleged that his abuser was "his priest, counselor and spiritual advisor." *Holy See*, 557 F.3d at 1070. The plaintiff also alleged that the priest "used his position of authority" to sexually abuse the plaintiff in the church monastery and surrounding areas. *Id.* at 1083. The court reasoned that these allegations were like those in *Fearing* and stated a *respondeat superior* claim. *Id.*

Here, Defendant Benoit abused Plaintiff on Holy Redeemer property—in the confessional, altar vestry, bathroom, storage room, and basement. Defendant Benoit had some authority over Plaintiff in these areas through Defendant Benoit's roles in leading mass and hearing confessions. Because Defendant Benoit abused Plaintiff in locations connected to his authority like the priest in *Doe v. Holy See* whose acts of abuse occurred in the church monastery, a reasonable jury could find Defendant Benoit used his position of authority to commit the abuse. For example, Defendant Benoit's role in leading mass allowed Defendant Benoit some authority over Plaintiff in the altar vestry and could have resulted in the abuse, particularly the abuse that occurred while Plaintiff prepared for altar service. Further, the abuse took place shortly before and after mass—one of Defendant Benoit's employment duties. As a

result, there is a genuine issue as to whether the abuse was "a direct outgrowth" of acts within the scope of Defendant Benoit's employment under *Fearing* and *Doe v. Holy See. See Fearing*, 328 Or. at 377; *Holy See*, 557 F.3d at 1083.

### B.    Defendant Benoit's Emails with Plaintiff

Plaintiff also argues that the email exchanges between Plaintiff and Defendant Benoit give rise to a question of fact on the issue of Defendants' vicarious liability for Defendant Benoit's abuse of Plaintiff. In particular, Defendant Benoit's emails to Plaintiff discussed personal matters such as Plaintiff's faith, daily life, and social niceties. Defendants argue that Defendant Benoit's emails were outside the scope of his employment because he sent them from his personal email account.

Although Defendant Benoit sent the emails from his personal account and he did not have a youth pastor role, there are facts in the record from which a jury could conclude that these communications were within the scope of his employment. For example, Defendant Benoit signed the emails "Father Benoit." In addition, Father John Czyzynski (Defendant Benoit's provincial supervisor) testified that it might be appropriate for a priest to communicate via their personal email. Halpern Decl. I Ex 4 at 112:3-15, ECF No. 82-1. Defendants POSH and Archdiocese had no guidelines regarding priest communication with minor parishioners via email. Viewed most favorably to Plaintiff, this evidence raises a genuine issue of fact as to whether Defendant Benoit's emails were within the time and space limits of employment.

There is also evidence that Defendant Benoit's initial emails were motivated to serve the Defendants and were consistent with the type of work Defendant Benoit was hired to perform. Plaintiff understood that the emails were initially "priest-parishioner talking." Pl. Decl. ¶ 15. Moreover, Defendant Benoit testified that he did not tell anyone about the emails because it would have "destroy[ed] any trust in confidentiality that [Plaintiff] had with [him]." Pl. Dep.

Benoit 269:5-11. Defendant Benoit's emails concerned the spiritual and personal life of Plaintiff, an altar server and parishioner of Holy Redeemer. Although Defendant Benoit's desire to keep the emails confidential could relate to the abusive nature of the emails, a jury could reasonably conclude that Defendant Benoit sought to maintain Plaintiff's confidence in him, at least partially, as a source for priest-parishioner discussions. Thus, Plaintiff shows a genuine issue of material fact that the initial emails were motivated, at least partially and initially, by a desire to serve Defendants POSH and Archdiocese, and were consistent with the type of work Defendant Benoit was hired to perform. In light of these questions of fact, the Court finds that the determination of whether the emails were within the scope of Defendant Benoit's employment is properly made by a jury.

Defendants Archdiocese and POSH argue that, unlike the priest in *Fearing*, Defendant Benoit's actions did not cultivate trust with Plaintiff or Plaintiff's mother. The plaintiff in *Fearing* alleged that a priest "used his position as youth pastor, spiritual guide, confessor, and priest to plaintiff and his family" to spend alone time with plaintiff, touch plaintiff physically, gain the trust of plaintiff and plaintiff's family, and eventually sexually assault plaintiff. 328 Or. at 374. Since the plaintiff alleged that the priest performed acts within the scope of his employment "to gain the opportunity to commit the sexual assaults" and build a trusting relationship with plaintiff, a reasonable jury could find that the priest's pastoral acts "were a necessary precursor" to the abuse and that the abuse was "a direct outgrowth of . . . conduct within the scope of [the priest's] employment. *Id.* at 377. The court held that the plaintiff alleged sufficient facts to state a *respondeat superior* claim. *Id.*

Just as the priest in *Fearing* gained access to, social time with, and the trust of the plaintiff in that case through his employment duties as the plaintiff's spiritual advisor, Defendant

Benoit used his employment duties to communicate with Plaintiff and gain Plaintiff's trust. Defendant Benoit emailed with Plaintiff, talked with Plaintiff near the time for mass, and went to Plaintiff's basketball game. These acts allowed Defendant Benoit to socialize with Plaintiff, build a trusting relationship with Plaintiff, make small gifts to Plaintiff and his family, and eventually gain the opportunity to commit the sexual assaults. Because evidence supports a pattern of grooming as described under *Fearing*, Plaintiff raises a genuine dispute that the abuse was the "direct outgrowth" of Defendant Benoit's employment.

### C. Defendant Benoit's Leave of Absence from Defendant Priests of the Sacred Heart

Defendant POSH presents an additional argument not applicable to Defendant Archdiocese. Defendant POSH placed Defendant Benoit on a leave of absence in 1996 before he arrived at Holy Redeemer in 1998. Defendant Benoit testified that he was not performing POSH ministry during his leave of absence. Def. POSH Dep. Benoit 377:12-15. Defendant POSH therefore argues that because Defendant Benoit was placed on a leave of absence, he could not take any action to further POSH's interests.

However, the Court finds that there is a genuine dispute of fact on this issue. Specifically, Defendant Benoit's provincial, Father Czyzynski, actively participated in Defendant Benoit's placement and acquisition of faculties. Father Czyzynski wrote multiple letters of good standing leading to Defendant Archdiocese granting Defendant Benoit faculties and status as a visiting priest, and Plaintiff has presented evidence that Defendant Benoit's discussions with Plaintiff occurred within Defendant Benoit's authority under these faculties. Father Czyzynski transferred Defendant Benoit to Coos Bay and had final say over his assignments. Defendant Benoit also received a stipend and other benefits from POSH beginning in 1988. Because POSH advocated for and contributed to Defendant Benoit's duties in leading mass and serving as a visiting priest,

a reasonable juror could find that Defendant Benoit's emails and discussions with Plaintiff before, after, and during mass were within the scope of his employment with POSH.

In sum, there are genuine issues of material fact as to whether Defendant Benoit's sexual abuse of Plaintiff resulted from acts within Defendant Benoit's scope of employment with Defendants Archdiocese and POSH. Because a jury is best suited to resolve these issues of fact, Defendants' motions for summary judgment against Plaintiff's *respondeat superior* claims are denied.

## III.    Plaintiff's Admissions Relating to Certain Allegations of Defendant Benoit's Abuse

Defendant Archdiocese also moves for summary judgment against Plaintiff to the extent such claims are based on conduct which Plaintiff admitted at deposition did not occur. Plaintiff's Second Amended Complaint alleges that Defendant Benoit "perform[ed] oral copulation" on Plaintiff and "digitally penetrat[ed]" Plaintiff. 2d Am. Compl. ¶ 23, ECF No. 50-1. In deposition, however, Plaintiff affirmatively answered "no" when asked if these acts occurred. Def. Arch. Dep. Pl. 228:2-6. Based on these answers, Defendant Archdiocese moves for summary judgment dismissing Plaintiff's claims against it to the extent that such claims are based on these acts.

Plaintiff responds that evidence that those acts did not occur "does not negate the extensive sexual abuse and assaults committed by Fr. Benoit on Plaintiff when he was a minor." Pl.'s Opp'n to Def. Archdiocese of Portland's Mot. Summ. J. 27, ECF No. 82. In so arguing, Plaintiff fails to respond to the specific issue raised by Defendant Archdiocese in its motion. Defendant does not seek summary judgment on sexual abuse as a whole, only on that portion of Plaintiff's damages arising out of acts that Plaintiff testified—and has since also admitted at oral argument—did not occur. Rule 56(a) allows a party to move for summary judgment on a "part"

of a claim. Fed. R. Civ. P. 56(a). Reviewing Defendant Archdiocese's motion, that is what it seeks.

Plaintiff admitted that the conduct at issue did not occur and has not presented any legal argument that granting summary judgment on this portion of his damages is improper. Defendant Archdiocese is therefore entitled to summary judgment against the portion of Plaintiff's damages arising out of the conduct Plaintiff admits did not occur.

## IV.    Punitive Damages Claim Against Defendant Archdiocese

Finally, Defendant Archdiocese moves for summary judgment against Plaintiff's punitive damages claim, arguing that Oregon law does not recognize punitive damages under *respondeat superior* for actions taken outside the scope of an employment relationship. Because Plaintiff did not allege a negligence claim against Defendant Archdiocese, Defendant Archdiocese argues that it is entitled to summary judgment on punitive damages. At oral argument, Plaintiff conceded that he may not pursue punitive damages without alleging an underlying negligence claim against Defendant Archdiocese. Instead, he requested that he be permitted to amend his Complaint to assert a negligence claim or for the Court to treat his Complaint as though it were already amended.

Rule 15(a)(2) of the Federal Rule of Civil Procedure provides that the "court should freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). A district court should apply Rule 15's "policy of favoring amendments . . . with extreme liberality." *Price v. Kramer*, 200 F.3d 1237, 1250 (9th Cir. 2000) (quotation marks omitted). The purpose of the rule "is 'to facilitate decision on the merits, rather than on the pleadings or technicalities.'" *Novak v. United States*, 795 F.3d 1012, 1020 (9th Cir. 2015) (quoting *Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1152 (9th Cir. 2011)). A district court, however,

may, within its discretion, deny a motion to amend "due to 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of the amendment.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (alteration in original) (quoting *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008)). "Not all of the factors merit equal weight. As this circuit and others have held, it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

Weighing the above factors here, the Court declines to exercise its discretion to allow amendment. Allowing amendment now, long after the close of discovery, would severely prejudice Defendant Archdiocese. Throughout the entire course of discovery in this case, there were no claims asserted against Defendant Archdiocese relating to its own conduct. Rather, the claims asserted against it were based on vicarious liability. The Ninth Circuit has held that allowing amendment late in litigation which would "advance different legal theories and require proof of different facts" prejudices the non-moving party. *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 953 (9th Cir. 2006) (quoting *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1387 (9th Cir. 1990)). Because a negligence claim against Defendant Archdiocese involves a different legal theory requiring proof of different facts, and because Defendant had no reason to conduct discovery on those facts while discovery was still open, allowing amendment now would severely prejudice Defendant Archdiocese.

Moreover, Plaintiff has presented no evidence or persuasive argument as to why he did not assert a negligence claim against Defendant Archdiocese sooner. Indeed, Plaintiff *did* amend his Complaint in August 2023 to assert a negligence claim against POSH but did not do so

against Defendant Archdiocese. Fact discovery in this case closed on September 30, 2023, and expert discovery closed on June 1, 2024. ECF Nos. 53, 65. In evaluating undue delay, courts consider "whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading." *AmerisourceBergen*, 465 F.3d at 953 (citation omitted). Here, although some additional limited factual discovery was permitted after the formal close of discovery, it was limited to Defendant POSH's production of unredacted copies of council meeting minutes. Plaintiff fails to identify anything in those minutes or otherwise that would explain his delay seeking leave to amend his Complaint. Thus, the record supports that, at the close of discovery, Plaintiff knew or should have known the facts related to the negligence claim he now seeks. Absent an explanation for why Plaintiff did not seek amendment until nearly a year after fact discovery closed, Plaintiff's undue delay weighs strongly against allowing amendment.

In sum, because Plaintiff did not assert a negligence claim against Defendant Archdiocese, and because this Court will not permit amendment to add such a claim now, summary judgment is granted in Defendant Archdiocese's favor on Plaintiff's punitive damages claim against it.

## CONCLUSION

For the reasons above, Defendant Archdiocese's Motion for Summary Judgment, ECF No. 72, is GRANTED in part and DENIED in part as follows: Defendant Archdiocese is granted summary judgment on (1) Plaintiff's claims for punitive damages against Defendant Archdiocese, and (2) the portion of Plaintiffs' claims against Defendant Archdiocese that pertain to aspects of Defendant Benoit's abuse that Plaintiff admits did not occur. Defendant

Archdiocese's motion is otherwise denied. Defendant Priests of the Sacred Heart's Motion for

Partial Summary Judgment, ECF No. 74, is DENIED.

      DATED this <u>20th</u> day of December 2024.

                                  <u>s/ Mustafa T. Kasubhai</u>
                                  MUSTAFA T. KASUBHAI (He / Him)
                                  United States District Judge